Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Theodore Maya (SBN 223242)
tmaya@ahdootwolfson.com
Christopher Stiner (SBN 276033)
cstiner@ahdootwolfson.com
Deborah De Villa (SBN 312564)
ddevilla@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585

*Counsel for Plaintiffs and the Proposed Class*

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| IN RE: CALIFORNIA PIZZA KITCHEN DATA BREACH LITIGATION<br><br>This Document Relates To:<br>All Actions | Master File No. 8:21-cv-01928-DOC-KES<br><br>**PLAINTIFFS AVIVA KIRSTEN'S AND JEREMY PITTMAN'S OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**<br><br>Date:         June 9, 2022<br>Time:         7:30 a.m.<br>Judge:        Hon. David O. Carter<br>Courtroom:  9D |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................... 1

II.    BACKGROUND ...................................................................................... 3

III.   ARGUMENT ........................................................................................... 8

     A.    The Court Is Required To Apply Heightened Scrutiny To The Settlement. ...................................................................................... 8

     B.    The Amount Offered To The Class In This Purely Claims-Made Settlement Is Potentially Zero, Which Is Not Fair And Adequate In Light Of The Potential CPPA Statutory Damages Exposure to CPK of $77 Million. ...................................................................................... 8

     C.    There Is No Justification For The Reversionary Nature Of The Settlement. ...................................................................................... 9

     D.    The One-Time Direct Notice Program Is Not The Best Notice Practicable And, Along with a Shortened Claims Period And a Gag Order On Settling Plaintiffs' Counsel, Constitutes a Claim Suppression Scheme. ................. 10

     E.    The Clear Sailing Agreement For An Exaggerated $800,000 Fee Prior to Commencement of Discovery Strips The Class of Settlement Benefits And Is An Indication of Collusion Because It Disproportionately Favors The Lawyers. ...................................................................................... 11

     F.    The Settling Plaintiffs and Their Counsel Failed to Assert CCPA Claims and Are Not Adequate Representatives For the CCPA Subclass ............. 12

     G.    The Release is Overbroad and Violates Due Process. .............................. 13

     H.    The Circumstances Of the Settlement Further Indicate That The It Is A Product of Collusion and A Reverse Auction. ........................................... 14

     I.    The Presence of a Mediator is Not Persuasive Given the Myriad Facts Pointing to Collusion and Reverse Auction. .............................................. 16

IV.   CONCLUSION ..................................................................................... 18

OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta v. TransUnion, LLC,*
  243 F.R.D. 377, 385 (C.D. Cal. 2007) ............................................................. 12, 14, 17

*Allen v. Bedolla,*
  787 F.3d 1218 (9th Cir. 2015) .................................................................................... 8, 10

*Cohorst v. BRE Properties, Inc.,*
  No. 10-cv-2666, 2011 WL 3489781 (S.D. Cal. July 19, 2011) ................................. 14

*Eisen v. Carlisle & Jacquelin,*
  417 U.S. 156 (1974) ..................................................................................................... 10

*Figueroa v. Sharper Image Corp.,*
  517 F. Supp. 2d 1292 (S.D. Fla. 2007) ....................................................................... 14

*Hesse v. Sprint Corp.,*
  598 F.3d 581 (9th Cir. 2010) ....................................................................................... 13

*In re Bluetooth Headset Prods. Liab.,*
  654 F.3d 935 (9th Cir. 2011) ....................................................................... 2, 8, 12, 17

*In re Cmty. Bank of N. Virginia,*
  418 F.3d 277 (3d Cir. 2005) ........................................................................................ 14

*In re Lawnmower Engine Horsepower Mktg. & Sales Pracs. Litig.,*
  733 F. Supp. 2d 997 (E.D. Wis. 2010) ................................................................. 14, 15

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.,*
  No. 19-MD-2879, 2022 WL 1396522 (D. Md. May 3, 2022) ...................................... 9

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.,*
  895 F.3d 597 (9th Cir. 2018) ....................................................................................... 10

*Kim v. Allison,*
  8 F.4th 1170 (9th Cir. 2021) ..................................................................................... 2, 8

OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012) ................................................................. 12

*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ........................................................................... 10

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
  523 F.3d 1091 (9th Cir. 2008 ................................................................. 14

*Officers for Justice v. Civil Serv. Comm'n of S.F.*,
  688 F.2d 615 (9th Cir. 1982) ................................................................. 17

*Reynolds v. Beneficial Nat. Bank*,
  288 F.3d 277 (7th Cir. 2002) ................................................................. 14

*Roes, 1–2 v. SFBSC Management, LLC*,
  944 F.3d 1035 (9th Cir. 2019) ........................................................ *passim*

*Saucillo v. Peck*,
  25 F.4th 1118 (9th Cir. 2022) ............................................................ 2, 8

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ................................................................. 17

**Rules**

Fed. R. Civ. P. 16(f) ........................................................................... 5, 6
Fed. R. Civ. P. 23(e)(2) ......................................................................... 13

**Statutes**

Cal. Civ. Code § 1798.150(a)(1)(A) ............................................................. 9

**Other Authorities**

Kent M. Williams, *A Touch of Class: Reducing the Risk of "Sweetheart Deals"*, 62
  Bench & Bar of Minn. 20, 21 (2005) .......................................................... 15

OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL

## I.  INTRODUCTION

The Court should deny preliminary approval of the proposed nationwide class action Settlement because it is the product of collusion and a reverse auction, and is not fair, reasonable, and adequate.

The terms of the Settlement include a lethal combination of the strongest signals of collusion in pre-class certification class action settlements: reversion, a claim suppression scheme, and a clear sailing fee agreement.

There is no common fund, so the only sums California Pizza Kitchen ("CPK") has to pay out to the Class Members are the claims made and determined to be valid. The entire relief to the Class is reversionary.

The one-time mailing or e-mail notice includes no reminders, or any of the inexpensive supplemental notice programs—such as social media and internet targeting or the cost free use of CPK's employee intranet—that have become commonplace in notice programs designed to actually reach the class. The settling plaintiffs ("Settling Plaintiffs") also agreed to a gag order, so they may not utilize their own marketing resources to publicize the settlement without CPK's approval. The notice program falls far short of the "best notice practicable" standard and, combined with a 60-day claims period when 90 days is the common practice, is designed to minimize claims and CPK's payout.

Meanwhile, CPK has agreed to not oppose a fee application of $800,000 to the six firms representing Settling Plaintiffs ("Settling Plaintiffs' Counsel") who agreed to this deal without any discovery or litigation. The collusive Settlement is a great deal for CPK, who was happy to pay the attorney fees as long as its overall bottom line is minimized, and for the Settling Plaintiffs' Counsel, who are happy to pocket the hefty attorney fee after doing virtually no meaningful work in the litigation. But the settlement jilts the class with a possible payout of $0. In exchange for the reversionary benefits, Class members give up valuable statutory damages claims and any and all claims that "refer or relate to" the complaints, not just those based on an identical factual predicate. The overbroad release violates absent Class Members' due process rights.

This is a rotten deal for the Class for many reasons, including: (1) the statutory damages under the California Consumer Privacy Act ("CCPA") alone could exceed $77 million, so the $0 offered for a benefit fund is not justified; (2) the Settling Plaintiffs never asserted a CCPA claim (only *Kirsten* plaintiffs did) so they are not adequate representatives to settle those claims; (3) notice does not meet due process under the circumstances; and (4) the attorneys' fees are excessive given the results achieved and disproportionately devour the available cash. The additional presence of the collusive terms highlighted by the Ninth Circuit cannot pass the heightened scrutiny the Court must apply in reviewing this Settlement. *See Saucillo v. Peck,* 25 F.4th 1118 (9th Cir. 2022); *Roes, 1–2 v. SFBSC Management, LLC*, 944 F.3d 1035 (9th Cir. 2019); *Kim v. Allison*, 8 F.4th 1170, at 1182 (9th Cir. 2021); *In re Bluetooth Headset Prods. Liab.,* 654 F.3d 935, 940 (9th Cir. 2011).

Further, the collusion indicated by the presence of these alarming terms is amplified by the history of this case. CPK siloed the communications with the Settling Plaintiffs' Counsel and the Wolfson-Garber team from the beginning. It dangled the possibility of a quick claims-made settlement to *Kirsten* counsel, the Wolfson-Garber team. When they did not bite, and instead insisted on having a mediation and pre-mediation exchange of information so as to evaluate the claims thoroughly and have a rigorous negotiation, CPK stopped engaging with the Wolfson-Garber team and lied that no negotiations with other plaintiffs' counsel would take place until the Court appointed lead counsel. CPK picked the opponents who showed a willingness to (and ultimately did) sell out the Class and release valuable statutory damages claims they never even asserted on behalf of the Class, by agreeing to a paltry reversionary claims-made settlement, inferior notice, a claim suppression scheme, and an overbroad release, in exchange for a hefty attorney fee that far exceeds the work performed in the case or the result achieved for the Class. There can be no other explanation as to why CPK excluded *Kirsten* (one of the five cases on file) from the mediation. Pressured by the risk of not being appointed lead counsel through the normal consolidation and lead appointment procedures that *Kirsten* suggested and the Settling Plaintiffs' Counsel ultimately presented to the Court, the Settling Plaintiffs' Counsel

rushed to accept the self-serving terms on the eve of the deadline to file leadership applications.

In totality, the terms of the Settlement and the surrounding circumstances show that CPK conducted a reverse auction, and that the Settling Plaintiffs' Counsel and CPK colluded to enter a Settlement which guarantees only one type of payout—the attorney fees and costs, and service awards—in exchange for an overbroad release. The Court should apply the heightened scrutiny dictated by the Ninth Circuit and deny the Motion for Preliminary Approval. It should then hear and grant the Wolfson-Garber team's application to lead this litigation for the benefit of the Class. ECF No. 31.

## II.   BACKGROUND

Because of its inadequate and lax data security policies, CPK suffered a data breach (the "Data Breach") that exposed over 100,000 employees' names, Social Security numbers, dates of birth, financial information, and other personal private data (collectively, "PII") to nefarious actors. Plaintiffs and Class Members had no choice but to entrust their PII to CPK as a condition of their employment. Yet, despite CPK's assumption of legal and equitable duties to protect its employees' PII and its assertion that it understood the importance of those duties, it failed to adequately safeguard this private, sensitive data, leading to the Data Breach.

Five cases were filed within a span of 17 days, all of which were transferred to this Court.[1] *Kirsten* is the only case that alleged CCPA claims, which give rise to statutory damages between $100 and $750 per violation. Soon after *Kirsten* was filed, the Wolfson-Garber team reached out to all plaintiffs' counsel to meet and confer about streamlining efforts and potentially coming to consensus on leadership, but the Settling Plaintiffs' Counsel insisted on a bloated and extremely inefficient slate of five groups of firms comprised of nine firms in total. Declaration of Tina Wolfson ("Wolfson Decl.") ¶ 3.

---

[1] *Kirsten*, No. 8:21-cv-09578-DOC-KES; *Gilleo*, No. 8:21-cv-01928-DOC-KES; *Wallace*, No. 8:21-cv-01970-DOC-KES; *Morales*, No. 8:21-cv-01988-DOC-KES; and *Rigas*, No. 8:21-cv-02004-DOC-KES.

The Wolfson-Garber team could not agree that such a bloated slate would benefit the Class. *Id.* Nevertheless, and contrary to the false representations that Settling Plaintiffs' Counsel Rachele Byrd made to the Court by stating that the Wolfson-Garber team "wanted to take the case for themselves and not work with us," Mot. Hr'g Tr., Apr. 22, 2022, at 11:10-12, the Wolfson-Garber team continued to meet and confer in the hope of coming to a compromise on leadership. The Wolfson-Garber team proposed a two-way leadership, with one qualified firm from the Settling Plaintiffs' Counsel and one firm from the Wolfson-Garber team to lead the case. But the Settling Plaintiffs' Counsel insisted on a 5-way leadership, in the hopes of controlling 80% of the case. Wolfson Decl. ¶ 3. The Wolfson-Garber team drafted and circulated a stipulation for consolidation and leadership briefing schedule on January 24, 2022, stating, "As we work toward streamlining these cases, *we can continue to meet and confer* regarding self-organization and a leadership structure. *We look forward to working with all of you.*" *Id.* ¶ 5. (emphasis added). The Wolfson-Garber team also met and conferred regarding consolidation with defense counsel. *Id.* ¶ 6. A week-and-a-half later, the Settling Plaintiffs' Counsel circulated a different version of Wolfson-Garber team's stipulation, claiming authorship and that they had met and conferred with defense counsel. *Id.* But Ms. Wolfson confirmed with CPK's counsel Mr. Grimaldi that prior to her reaching out to meet and confer regarding consolidation, no other plaintiffs' counsel had done so. *Id.* The Settling Plaintiffs' Counsel apparently duplicated work for the sole reason of optics that it somehow was in charge of the litigation, posturing and highlighting the very inefficiencies Wolfson-Garber team had been concerned about. *Id.* ¶ 7.

Meanwhile, CPK filed a motion to dismiss *only* in the *Kirsten* matter, despite that the Wolfson-Garber team was willing to stipulate to continue the briefing pending a consolidation. *Id.* ¶ 8. The Court set a Rule 26(f) conference. *Kirsten*, ECF No. 21. In the spirit of cooperation, disclosure, and inclusion, on February 8, 2022, Ms. Wolfson circulated the Court's order to all plaintiffs' counsel. Wolfson Decl. ¶ 9. Rather than coordinate with the *Kirsten* team, the Settling Plaintiffs' Counsel responded by attaching

- 4 -

yet another version of the consolidation stipulation, demanding a response "by cob today." *Id*. ¶ 10. On the same day, Ms. Wolfson circulated redlines to this version of the draft stipulation and order, after meeting and conferring with and obtaining consent from defense counsel about the Wolfson-Garber team's proposed changes, including a shortened lead counsel application and briefing schedule. *Id*.

On the afternoon of February 9, 2022, the Settling Plaintiffs' Counsel rejected the changes and circulated a revised version of the stipulation which again included a prolonged leadership briefing schedule, requesting that the *Kirsten* team consent to its filing. *Id*. In retrospect, it is clear that the Settling Plaintiffs' Counsel insisted on a prolonged leadership briefing schedule so that they had additional time to consummate their collusive dealings with CPK, despite that it was in the best interest of the Class to have the Court peruse qualifications and decide the lead counsel question quickly, in the event further meet and confer efforts over leadership proved unsuccessful. Prior to receiving any response, the Settling Plaintiffs' Counsel filed yet another version of the stipulation, omitting *Kirsten* altogether. *Id*.; *see* ECF No. 20. Although the Order granting the stipulation (ECF No. 21), also drafted by Settling Plaintiffs' Counsel, required that team to file it in any related matter, they failed to do so in *Kirsten* or to serve the stipulation on the Wolfson-Garber team. *See* ECF No. 21; Wolfson Decl. ¶ 11.

On February 9, Mr. Grimaldi and Ms. Wolfson also met and conferred about scheduling in *Kirsten* and discussed the possibility of early resolution pursuant to Fed. R. Civ. P. 16(f). Wolfson Decl. ¶ 12. Following that discussion, Mr. Grimaldi sent a follow-up email advocating his views of the case and asking, "*Would you consider for example a claims made style settlement*? Do you have a proposed term sheet?" *Id.* (emphasis added).

Approximately one week later, the Wolfson-Garber team responded that in order to engage in settlement discussions, information should be exchanged and a mediation should be set. *Id.* Mr. Grimaldi stated he would discuss the proposal with his client. *Id.*

Armed with the knowledge that Wolfson-Garber would not accept the claims-made terms CPK was proposing, and knowing that only the Wolfson-Garber team alleged CCPA

claims, CPK counsel secretly mediated with the Settling Plaintiffs' Counsel who eagerly accepted those terms plus a suppressed notice program and shortened claims period, in exchange for an $800,000 payout to themselves. Neither the Settling Plaintiffs' Counsel nor CPK apprized the Wolfson-Garber team of that mediation because they did not want to face opposition from a counsel team that would actually stand up for the rights of the Class. There can be no other explanation for excluding the Wolfson-Garber team from the consolidation and the mediation. Moreover, it was imperative for these colluding parties to keep the Wolfson-Garber team in the dark about the fact of mediation and the terms of the Settlement in order to minimize the possibility of the Court being alerted about the potential reverse auction and collusion.

Mr. Grimaldi again met and conferred pursuant to Fed. R. Civ. P. 26(f) with the Wolfson-Garber team on March 14, 2022, after the March 10 mediation took place and a day before the March 15 mediation was scheduled to occur. Wolfson Decl. ¶ 13. During this discussion, the Wolfson-Garber team discussed mediation again and specifically asked Mr. Grimaldi whether CPK was negotiating with any other plaintiff counsel, and the status of such discussions. *Id*. Mr. Grimaldi purposefully misled the Wolfson-Garber team, stating that CPK wanted to wait until lead counsel is appointed before engaging in substantive settlement efforts and deliberately omitted that mediation had taken place. *Id*. In violation of his duty of candor to the Court, he subsequently failed to tell the Court in the joint Rule 26(f) report that was filed later that day that mediation had taken place. *Id.*; *see Kirsten*, ECF No. 27.

Then, on March 16, 2022, the eve of the deadline to file lead counsel applications (a deadline that Settling Plaintiffs' Counsel set), and without meeting and conferring with or serving the Wolfson-Garber team, the Settling Plaintiffs' Counsel and CPK filed a stipulation to stay the litigation pending final approval of the Settlement. ECF No. 29. As the filing references, counsel e-mailed the Court without copying the Wolfson-Garber team. Wolfson Decl. ¶ 18. The Wolfson-Garber team e-mailed the Court Clerk to notify that it would be opposing the stay request. *Id*.

The Wolfson-Garber team filed a Motion to Appoint Tina Wolfson and Todd S. Garber as Interim Lead Counsel for the Plaintiffs and Opposition to the Motion to Stay Proceedings on March 17, and it was scheduled to be heard on April 18, 2022. ECF No. 31. Further indicative of the collusion between CPK and Settling Plaintiffs' Counsel, CPK opposed the requested leadership appointment. ECF Nos. 34, 35. This opposition is highly unusual and again supports the existence of a reverse auction: what other possible reason could CPK, a defendant, have to choose the opponent with whom to negotiate if not to consummate the reverse auction?

Not one representative from the Settling Plaintiffs' Counsel team appeared at the April 18, 2022 hearing on the Wolfson-Garber team's motion, so the Court continued the hearing to April 22, 2022. *See* ECF No. 37. On April 22, 2022,  the Court determined that it would reserve judgment on the issue of lead counsel until the terms of the Settlement have been presented to the Court as part of the Motion for Preliminary Approval. *See* ECF No. 41.

Under the terms of Settlement Agreement, all benefits are completely reversionary as CPK is obligated to pay only claims that are made and determined to be valid. Settlement Agreement ("SA") ECF No. 44-3 ¶¶ 3(a)-(d), 4(a), 7(b). The only definite amount that CPK agrees to pay is the $800,000 attorney fee and $2,000 Service Awards to the named plaintiffs. SA ¶ 5(a)-(b). Thus, hypothetically, CPK could pay $0 to the class if no valid claims are made, but it would still be obligated to pay the large attorney fee.

Simultaneously, the notice provides for just one direct email or postcard. SA ¶ 12. Starkly missing from the notice plan is any reminder notices, economical yet effective notice supplements through CPK's employee intranet forum, or an internet/social media campaign. The only possible reason to omit such common notice enhancements is to suppress the number of claims made and minimize the total payout and cost of the Settlement to CPK.

### III.   ARGUMENT

#### A.   The Court Is Required To Apply Heightened Scrutiny To The Settlement.

Trial courts within the Ninth Circuit must conduct a heightened inquiry when reviewing class action settlements negotiated without a certified class. It is reversible abuse of discretion to fail to apply "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)(2)" to a settlement negotiated absent class certification. *Roes, 1-2*, 944 F.3d at 1043 (quoting *In re Bluetooth*, 654 F.3d at 946); *Saucillo*, 25 F.4th at 1133 ("[B]ecause the district court abused its discretion by employing an erroneous legal standard, we vacate its approval of the class-action settlement"); *Kim*, 8F.4th at 1179 (reversing district court's approval of settlement because it did not apply heightened scrutiny to pre-certification settlement that included clear sailing provision and awarded fee request "that outstripped the likely financial benefit to the class.").

The Court must not only explore all Rule 23(e)(2) factors comprehensively, but also scrutinize any "subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations." *Roes, 1-2*, 944 F.3d at 1043 (citations omitted). Such "subtle signs" of collusion that district courts are required to look for include, for example "(1) 'when counsel receive a disproportionate distribution of the settlement;' (2) 'when the parties negotiate a 'clear sailing' arrangement' (i.e., an arrangement where defendant will not object to a certain fee request by class counsel); and (3) when the parties create a reverter that returns unclaimed [funds] to the defendant.'" *Allen v. Bedolla*, 787 F.3d 1218, 1224 (9th Cir. 2015) (quoting *In re Bluetooth*, 654 F.3d at 947).

#### B.   The Amount Offered To The Class In This Purely Claims-Made Settlement Is Potentially Zero, Which Is Not Fair And Adequate In Light Of The Potential CPPA Statutory Damages Exposure to CPK of $77 Million.

The Class here is imminently certifiable because CPK's uniform data security policy and procedures affected each victim of the data breach. Numerous models of class-wide

damages exist and courts are certifying plaintiff classes as this litigation area develops. *See, e.g., In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, No. 19-MD-2879, 2022 WL 1396522, at *28 (D. Md. May 3, 2022) (granting, in part, motion for class certification in data breach litigation, and accepting proposed class-wide damages model that "provides a common, formulaic method for calculating individual damages and does not require too much individualized inquiry."). The Wolfson-Garber team work with experts who can propose damage models to evaluate the information compromised to be worth $200 per class member. Wolfson Decl. ¶ 19. Additionally, and at minimum for California residents, statutory damages under the CCPA are available in the amount of $100 to $750 per violation. Cal. Civ. Code § 1798.150(a)(1)(A).

Assuming the class size reported by CPK is correct, and applying $200 per non-California Class Member (72,986) and $750 per California Class Member (30,781), CPK's outer limit of liability is at least approximately $38 million. If the CCPA applies to companies headquartered in California, regardless of where their victims reside (an unsettled issue), then that liability could be $77 million. The terms of the Settlement, however, offer no guaranteed amounts to the Class Members. The only guaranteed payment under the Settlement is the $800,000 in attorney fees. Other than the typical inherent risk of litigation, the Settling Plaintiffs' Counsel offer no rationale as to why the case should be settled this early for such a steep discount. The amount offered in Settlement is unfair, unreasonable  and inadequate even outside the other unfair and collusive terms of the Settlement.

### C. There Is No Justification For The Reversionary Nature Of The Settlement.

Reversionary clauses are highly disfavored in the Ninth Circuit because they create "perverse incentive[s]." *Roes, 1-2*, 944 F.3d at 1058. "[A]llowing unclaimed funds to revert to defendants even where class members who do not respond or submit a claim are bound by the class release creates an incentive for defendants to ensure as low a claims rate as possible so as to maximize the funds that will revert." *Id.* (citing *In re Volkswagen "Clean*

*Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 895 F.3d 597, at 611-12 (9th Cir. 2018)). "This perverse incentive might lead defendants to negotiate for a subpar notice process, a more tedious claims process, or restrictive claim eligibility conditions." *Id*. at 1059 (citing *In re Volkswagen*, 895 F.3d at 611). "Moreover, '[a] reversion can benefit both defendants and class counsel, and thus raise the specter of their collusion, by (1) reducing the actual amount defendants are on the hook for, especially if the individual claims are relatively low-value, or the cost of claiming benefits relatively high; and (2) giving counsel an inflated common-fund value against which to base a fee motion.'" *Id.* (quoting *In re Volkswagen*, 895 F.3d at 611). As a result, courts have identified reversionary clauses as a "subtle sign[ ] that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations." *Id.* (citing *Allen*, 787 F.3d at 1224).

The proposed Settlement here is *entirely* reversionary and, combined with the inadequate notice program and claim suppression scheme, and a clear sailing fee provision, makes the concerns regarding perverse incentives and implicit collusion all the more salient. The Settling Plaintiffs' Counsel offer no countervailing justification as to why the purely reversionary nature of the Settlement is justified. The Court should deny preliminary approval.

**D.     The One-Time Direct Notice Program Is Not The Best Notice Practicable And, Along with a Shortened Claims Period And a Gag Order On Settling Plaintiffs' Counsel, Constitutes a Claim Suppression Scheme.**

In order to meet the constitutional guarantee of procedural due process, "notice must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). That is, "[t]he means employed [to provide notice] must be such as [a person] desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane*, 339 U.S. at 315; *see also Roes, 1-2*, 944 F.3d at 1045-46 (same).

- 10 -

The notice plan employed in this case—a one-time mail or e-mail notice—is not the best notice practicable because it omits (1) a reminder notice program, (2) a targeted social media/internet advertising campaign, and (3) a publication of the notice through CPK's employee intranet or other internal employee communication system. (*See* http://www.imagistic.com/news/imagistic-delivers-new-california-pizza-kitchen-web-site-intranet (last visited May 19, 2022)). The third option is free, and the first two options cost very little and have become commonplace effective tools in class action settlements. Wolfson Decl. ¶ 15. Furthermore, the Settling Plaintiffs' Counsel agreed to be bound by a gag order prohibiting them from publicizing the Settlement through their own marketing tools without CPK's permission, thus giving up another economical way to apprize Class Members of the Settlement. SA ¶ 25.

Inadequate notice is, alone, reason enough to reject this Settlement and is particularly troubling when additional, inexpensive means are available to ensure that Class Members are informed about the settlement. *Roes 1-2*, 944 F.3d at 1046-1047 (finding it "particularly problematic" that other than mailing, the settlement provided no other means of reaching former employees, such as social media or online message boards). Combined with a shortened claims period of 60 days, when 90 days is the "gold standard" (Wolfson Decl. ¶ 16), and the "gag" agreement to not publicize the settlement (SA ¶ 25), it is part of the claim suppression scheme that CPK demanded in order to minimize its pay out, and the Settling Plaintiffs' Counsel agreed to in exchange for the clear sailing fee agreement of $800,000.

**E.    The Clear Sailing Agreement For An Exaggerated $800,000 Fee Prior to Commencement of Discovery Strips The Class of Settlement Benefits And Is An Indication of Collusion Because It Disproportionately Favors The Lawyers.**

The Settlement provides that CPK will not object to an amount of $800,000 paid in attorney fees. SA ¶ 5(a). "'"[C]lear sailing agreements" on attorneys' fees are important warning signs of collusion' because '[t]he very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to

- 11 -

the class . . . .'" *Roes, 1-2*, 944 F.3d at 1051 (quoting *Lane v. Facebook, Inc.*, 696 F.3d 811, 832 (9th Cir. 2012); *In re Bluetooth*, 654 F.3d at 948).

"As a result, 'when confronted with a clear sailing provision, the district court has a heightened duty to . . . scrutinize closely the relationship between attorneys' fees and the benefit to the class, being careful to avoid awarding "unreasonably high" fees simply because they are uncontested.'" *Id.* (quoting *In re Bluetooth*, 654 F.3d at 948). Here, there is no common fund for the benefit of the class, and CPK is liable only for claims made that are deemed to be valid, which can potentially be $0. (The probability of a zero dollar payout is heightened by the claim suppression scheme described above.) Compared to this amount, the agreed upon $800,000 fee is starkly overblown. The discrepancy between the $0 amount guaranteed to the class and the $800,000 in attorneys' fees CPK agrees not to contest supports a finding that the Settlement is not fair, reasonable, and adequate, and is the product of collusion.

The Settling Plaintiffs' Counsel attempt to justify the hefty attorneys' fees as a percentage of some imaginary fund is feeble. *See* ECF No. 44-1, at 7-8 (suggesting that the proposed $800,000 fee "represents less than 25% of an extremely conservative estimated value of this settlement."). The Settling Plaintiffs' Counsel cannot rely on authority supporting 25% of a common fund as the benchmark for fees because they did not actually obtain a common fund for the class. The claims-made settlement they achieved, which CPK was apparently willing to do from the get-go, is not a result that justifies such a large award, particularly in light of the fact that no motion practice or discovery took place.

**F.      The Settling Plaintiffs and Their Counsel Failed to Assert CCPA Claims and Are Not Adequate Representatives For the CCPA Subclass.**

None of the Settling Plaintiffs asserted a CCPA claim, even though the Settlement falsely claims they did. SA at 1 (Recitals) & ¶ 9. Plaintiffs who do not assert certain causes particular to a subclass are not able to act solely for the benefit of that subclass and  cannot adequately represent the subclass in releasing their claims. *See Acosta v. TransUnion, LLC*, 243 F.R.D. 377, 385 (C.D. Cal. 2007) (Carter, J.); *Hesse v. Sprint Corp.*, 598 F.3d 581,

588-89 (9th Cir. 2010). The Court cannot certify the class for settlement purposes because the class representatives are not adequate to negotiate and release the CCPA claims.

Furthermore, the failure of the Settling Plaintiff Counsel to assert the CCPA claim in the first place calls into question their adequacy and weighs against their appointment as Class Counsel, and against preliminary approval. Fed. R. Civ. P. 23(e)(2).

That the Settlement purports to release the CCPA claim while none of the Settling Plaintiffs bothered to assert it further highlights the collusive nature of this Settlement. The CCPA claim is arguably the most valuable claim in the litigation against CPK and presents the biggest leverage for negotiations because of the statutory damages it provides. CPK intentionally chose the weakest opponents in this litigation to negotiate with, while excluding the one case that did assert CCPA claims from the mediation. If the Settling Plaintiffs and their counsel did not think the CCPA claim worth filing, one can hardly assume that they were prepared to zealously prosecute the claim or negotiated the best deal in exchange for the release of that claim. These circumstances further highlight the collusive nature of these rushed negotiations and militate against preliminary approval.

### G.      The Release is Overbroad and Violates Due Process.

The Settlement purports to release "any and all claims or causes of action, whether known or unknown, that *concern, refer or relate to* the Data Security Incident announced by CPK on or about November 15, 2021, and all other claims arising out of the Data Security Incident announced by CPK on or about November 21, 2021, that were asserted, or that could have been asserted, in the Consolidated Cases. SA ¶ 9 (emphasis added). Such broad "related to" release clauses violate due process of absent class members and only claims based on an "identical factual predicate" as the claims alleged in the complaint may be released. *Hesse*, 598 F.3d at 590. The inclusion of such overbroad release language further calls into question the adequacy of counsel. The Court should deny preliminary approval.

**H.     The Circumstances Of the Settlement Further Indicate That The It Is A Product of Collusion and A Reverse Auction.**

The combination of a totally reversionary benefit to the Class, a clear sailing provision for an excessive fee, a subpar notice plan, and a blatant claim suppression scheme cannot pass the heightened scrutiny the Court must apply to this rushed pre-certification settlement prior to any litigation or formal discovery. The particular circumstances of this case further establish the presence of collusion and reverse auction and compel denial of preliminary approval.

When a party is allowed to choose its own adversary, a defendant has every incentive to reach an early, potentially collusive settlement with whichever of its opposing counsel will offer the defendant the "easiest" settlement. This phenomenon is known as the "reverse auction." *Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1099-1100 (9th Cir. 2008; *Cohorst v. BRE Properties, Inc.*, No. 10-cv-2666, 2011 WL 3489781, at *8 (S.D. Cal. July 19, 2011) ("A reverse auction is said to occur when the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a weaker settlement than could have been negotiated by other class counsel."); *see also Reynolds v. Beneficial Nat. Bank,* 288 F.3d 277, 283 (7th Cir. 2002) (Posner, J.) (rejecting "a settlement proposal of such questionable antecedents and circumstances" which may have been the product of a reverse auction); *Acosta*, 243 F.R.D. at 399-400 (denying final approval because the "Court has grave doubts that this settlement is the result of a process that was sufficiently adversarial or conducted at arm's-length"); *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 308 (3d Cir. 2005) (reversing final approval because of procedural failures, including that the court "cannot avoid consideration of the issue of potential collusion" and lack of arms-length negotiations); *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1321 (S.D. Fla. 2007) (denying final approval where defendant selected the weakest plaintiff's counsel with whom to settle).

The holding of *In re Lawnmower Engine Horsepower Mktg. & Sales Pracs. Litig.*, 733 F. Supp. 2d 997, 1006 (E.D. Wis. 2010) is particularly instructive here. There, the court

- 14 -

held that "a reverse auction could not have occurred because I appointed class counsel for purposes of this MDL proceeding without any input from defendants." *Id.* (citing Kent M. Williams, *A Touch of Class: Reducing the Risk of "Sweetheart Deals*,*"* 62 Bench & Bar of Minn. 20, 21 (2005) (noting defendant's ability to select negotiating partner is eliminated when class actions are removed to federal court and related cases are consolidated before the same judge, who chooses lead counsel and gives exclusive authority to negotiate a settlement)).

Here, CPK siloed its communications to the Settling Plaintiffs' Counsel on the one hand, and the Wolfson-Garber team on the other. It presented an offer of a claims-made only settlement to both groups. The Wolfson-Garber team declined, and when the team exercised their fiduciary duty to the Class and demanded that any settlement discussions be conducted without condition and only after seminal information was exchanged, CPK stopped settlement discussions and lied to the Wolfson-Garber team by stating that discussions would take place only after the Court appointed lead counsel. Wolfson Decl. ¶ 14. Meanwhile, CPK held secret settlement discussions with the Settling Plaintiffs' Counsel, who must have indicated their willingness to deal on a purely reversionary basis under a claims made structure, and ultimately agreed to those term, as well as lackluster notice and claim suppression scheme, and an overbroad release—all for a clear sailing agreement on the excessive attorney fees.

At the same time, the Settling Plaintiffs' Counsel, for their part, brought a self-serving, proprietary, and antagonistic attitude to meeting and conferring with the Wolfson-Garber team from the beginning of communications concerning this litigation. *Id.* ¶ 3. The communications quickly broke down when the Wolfson-Garber team declined to accept the bloated and inefficient leadership structure proposed by the Settling Plaintiffs' Counsel out of a belief that it is not in the best interest of the Class. Accordingly, the Wolfson-Garber team proposed that the parties enter into a stipulation to consolidate all of the cases and a briefing schedule for Rule 23(g) appointment by the Court, while continuing to meet and confer. *Id.* ¶ 4. After initially delaying and then insisting on a prolonged leadership

appointment application briefing schedule, the Settling Plaintiffs' Counsel ultimately filed a stipulation to consolidate their four cases only and for a prolonged lead counsel briefing schedule. *See* ECF No. 20. Despite that those lawyers requested the lead counsel application process, in order to avoid the risk of not being appointed lead counsel, the Settling Plaintiffs' Counsel rushed to reach a resolution on March 16, the eve of the deadline to file lead applications (the day after Settling Plaintiffs' Counsel apparently went to a second day of mediation on March 15), and requested that the cases be stayed. ECF No. 29.

The rushed timing of the Settlement is particularly troubling in light of the fact that CPK continued to litigate with the Wolfson-Garber team, bringing two motions to dismiss in *Kirsten*, meeting and conferring pursuant to Rule 26(f) and filing a joint report, and serving frivolous objections to the discovery served by the Plaintiffs in *Kirsten*. Wolfson Decl. ¶ 17. Thus, any justification that could exist for a rushed settlement, such as the conservation of the parties' limited resources, does not exist here because CPK has unlimited resources, and it used them to heavily litigate with one group while entering a collusive settlement with another, rather than conserve them. What legitimate interest could there be to rush into a secret settlement just on the eve of the lead counsel motion deadline? What legitimate reason could there be to exclude Plaintiffs in one of the five cases from consolidation and mediation? Why mislead the Court that settlement discussions are not taking place with a subset of the plaintiffs' attorneys in the Rule 26(f) report, when, in fact, they were? All facts—as well as the terms of the Settlement—point to obfuscating the Court's scrutiny, collusion, and a reverse auction.

## I.     The Presence of a Mediator is Not Persuasive Given the Myriad Facts Pointing to Collusion and Reverse Auction.

The Settling Plaintiffs ask the Court to rubber stamp the Settlement because Mediator Bruce Friedman oversaw the mediation. This fact is not dispositive, or even persuasive in light of the myriad signs of collusion and reverse auction. As the Ninth Circuit has many times explained, "[t]he incentives for the negotiators to pursue their own self-

interest and that of certain class members are implicit in the circumstances and can influence the result of the negotiations without any explicit expression or secret cabals." *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003). Thus, "the mere presence of a neutral mediator . . . is not on its own dispositive of whether the end product is a fair, adequate, and reasonable settlement agreement." *In re Bluetooth*, 654 F.3d at 948. Instead, the "real dangers in the negotiation of class action settlements of compromising the interests of class members for reasons other than a realistic assessment of usual settlement considerations" are "why district court review of class action settlements includes not only consideration of whether there was actual fraud, overreaching or collusion but, as well, substantive consideration of whether the terms of the decree are 'fair, reasonable and adequate to all concerned.'" *Staton*, 327 F.3d at 959–60 (quoting *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982)); *see also In re Bluetooth*, 654 F.3d at 948 (quoting *Staton*, 327 F.3d at 960) ("While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of '*actual* fraud, overreaching or collusion,' the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations."). *See Acosta*, 243 F.R.D. at 399-400 (this Court denied final approval where it had "grave doubts that this settlement is the result of a process that was sufficiently adversarial or conducted at arm's-length despite the presence of a mediator").

Moreover, the Declaration of Bruce Friedman, filed in support of the Motion for Preliminary Approval, is not informative or probative. Mr. Friedman is likely not aware of events occurring outside of mediation, including communications between counsel. While replete with conclusory statements about his own observations during the mediation, Mr. Friedman does not tackle the troubling issues presented by both the inherently collusive terms of the proposed Settlement, or the troubling circumstances surrounding this mediation and rushed resolution.

The Court is the fiduciary to the Class, not the mediator, and should use its own judgment in applying high scrutiny to this Settlement. Preliminary approval should be denied.

## IV.    CONCLUSION

For all the foregoing reasons, the Court should deny preliminary approval of the Settlement and hold the hearing on the Motion for Appointment of Interim Lead Counsel.

Dated: May 19, 2022                              Respectfully submitted,


                                                 /s/ Tina Wolfson
                                                 Tina Wolfson (SBN 174806)
                                                 twolfson@ahdootwolfson.com
                                                 Theodore Maya (SBN 223242)
                                                 tmaya@ahdootwolfson.com
                                                 Christopher Stiner (SBN 276033)
                                                 cstiner@ahdootwolfson.com
                                                 Deborah De Villa (SBN 312564)
                                                 ddevilla@ahdootwolfson.com
                                                 **AHDOOT & WOLFSON, PC**
                                                 2600 W. Olive Avenue, Suite 500
                                                 Burbank, CA 91505
                                                 Telephone: (310) 474-9111
                                                 Facsimile:  (310) 474-8585

                                                 Todd. S. Garber (*pro hac vice* pending)
                                                 tgarber@fbfglaw.com
                                                 Andrew C. White (*pro hac vice*)
                                                 awhite@fbfglaw.com
                                                 **FINKELSTEIN, BLANKINSHIP,**
                                                 **  FREI-PEARSON & GARBER, LLP**
                                                 One North Broadway, Suite 900
                                                 White Plains, New York 10601
                                                 Telephone: (914) 298-3281
                                                 Facsimile:  (914) 824-1561

- 18 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Seth A. Meyer (*pro hac vice* to be filed)
sam@kellerlenkner.com
Alex J. Dravillas (*pro hac vice* to be filed)
ajd@kellerlenkner.com
**KELLER LENKNER LLC**
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
Telephone: (312) 741-5220

*Counsel for Plaintiffs and the Proposed Class*

- 19 -